IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JACOB JAMES TOWNSEND                                                      PLAINTIFF

v.                                        Civil No. 4:23-cv-04002-SOH-CDC

SERGEANT MERCHANT;
CORRECTIONAL OFFICER HICKEY
SERGEANT GULLY;
JAMES WISE; and SHERIFF
JAMES SINGLETON                                                        DEFENDANTS


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

This is a civil rights action filed *pro se* by Plaintiff, Jacob James Townsend, pursuant to 42 U.S.C. § 1983.  Plaintiff names as Defendants Sergeant Merchant, Correctional Officer Hickey, Sergeant Gully, Captain James Wise, and Sheriff James Singleton.[1]  Plaintiff alleges his claims against all Defendants in both their official and individual capacities.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3).   Chief United States District Judge Susan O. Hickey referred this case to the undersigned for the purpose of making a Report and Recommendation.  Before the Court is Defendants' Motion for Summary Judgment (ECF No. 30) and Plaintiff's response.  (ECF No. 38).

**I.  BACKROUND**

All the events complained of by Plaintiff took place while he was incarcerated in the Hempstead County Detention Center ("HCDC") in Hope, Arkansas.  At all times relevant, all Defendants were employees at the HCDC save for Defendant Singleton who is the Sheriff of

---

[1] Plaintiff also named a John Doe Sheriff's Deputy as a Defendant but failed to identify that Defendant pursuant to the Court's Initial Scheduling Order.  Accordingly, Chief Judge Hickey terminated Defendant John Doe by Order dated June 3, 2024.  (ECF No. 39).

Hempstead County. (ECF No. 7, p. 2-4). Plaintiff indicates in his Amended Complaint that he was convicted in September 2022 which means Plaintiff was a pretrial detainee during the first incident on January 7, 2022 (Claim One), and a convicted inmate on January 9, 2023, when the second incident occurred (Claim Two). *Id.* at 2, 5, 9. Plaintiff alleges official and individual capacity claims against all Defendants and seeks compensatory and punitive damages. *Id.* at 11, 13. While Plaintiff labels only two separate claims, he alleges two distinct claims under Claim One and again under Claim Two – each Claim includes allegations of excessive force and denial of medical care.[2] *Id.*

Before enumerating the relevant facts from the summary judgment record related to each of Plaintiff's claims, it is helpful to understand the timeline of Plaintiff's transfers in and out of custody at the HCDC. Plaintiff was booked into the HCDC on January 7, 2022, and released on January 10, 2022. (ECF No. 32-2, p. 1). Plaintiff was booked into HCDC on January 13, 2022, and released on February 7, 2022. *Id.* at 2. Plaintiff was booked into the HCDC a third time on May 3, 2022, and released the following day, May 4, 2022. *Id*. at 3; (ECF No. 32-1, pp. 2-3). Another incarceration of Plaintiff at the HCDC occurred from May 24, 2022, through August 22, 2022. (ECF No. 32-1, p. 2). Finally, Plaintiff was incarcerated at the HCDC from January 6, 2023, through January 10, 2023. (ECF No. 32-1, p. 2; 32-2, p. 4).

### A. Claim One

Plaintiff alleges in Claim One that Defendants Merchant, Hickey, Wise, and Singleton violated his constitutional rights by using excessive force and then denying him medical care in

---

[2] Plaintiff also lists "Cruel and Unusual punishment" under each claim. However, this standard does not apply to Plaintiff's Claim One as he was a pretrial detainee. Accordingly, the Court will apply the correct standard in its analysis herein on Claim One. Further, the Court does not interpret Plaintiff's cruel and unusual assertion in Claim Two to be a separate claim but instead to be that the claimed use of force was cruel and unusual and thus, excessive.

connection with Plaintiff's booking into the HCDC on January 7, 2022.  (ECF No. 7, p. 5.)  The parties' versions of events differ significantly so the Court details both versions of the incident. The Court has considered and will summarize the video evidence, deposition testimony, grievances, and medical requests in the record.

### 1. Plaintiff's Assertions

In his Amended Complaint Plaintiff asserts:

On or around 1-7-2022, I was booked in to [HCDC] by [Defendants Merchant and Hickey].  After being strip searched, [Defendant] Merchant demanded that I give him my underwear.  He advised me that I could only have 'white' underwear.  I asked [Defendant] Merchant could I please have a pair of 'used' white underwear or purchase some from the jail's commis[s]ary because I was freezing.  He responded 'No!' this is your last direct order!  As he said this, I noticed [Defendant] Merchant shaking his can of pepper spray while appearing to have a malicious and sadistic look on his face.  I began to explain that I would give him my boxers when, without warning or provocation, [Defendant] Merchant unleased his can of pepper spray directly in my eyes, mouth, and face from approximately 4 feet away.  At that point, I immediately stripped off my underwear and ran into the shower (located directly behind me) in order to rinse my burning eyes and face.  As I stood naked under the running water, [Defendant] Merchant then entered the shower and struck me in the back of my head with a closed fist.  At that moment I was terrified and thought [Defendant] Merchant was [going to] kill me.

While [Defendant] Hickey stood in the doorway watching, I managed to escape [Defendant] Merchant's barrage of punches and run past him and [Defendant] Hickey into the general book-in area where I would be visible on the jail's camera system.  I then quickly grabbed ahold of the 'closest thing bolted down' (file cabinet) and proceeded to hold on for dear life.  As I stood clinging to the file cabinet naked and afraid, wet, and doused in pepper spray, [Defendant] Merchant and [Defendant] Hickey continuously beat at my hands and body in an attempt to pry my hands free and drag me back into the shower area and out of camera view. During this, I noticed Sheriff Deputy John Doe standing by the book-in desk approximately 10 feet away.  I screamed in his direction 'Help!Help! they trying to kill me!'  To my surprise and horror, he ran over only to assist [Defendant] Merchant and [Defendant] Hickey in prying my hands free and slamming me violently to the floor causing excruciating pain to my shoulder.  I was then handcuffed (face down) with my hands behind my back and lifted from the floor. At that point I begged them to please uncuff me so that I could wipe my eyes and rinse my face.  I had trouble breathing, extreme burning in my eyes and face, dizziness, excruciating shoulder pain, and head trauma.  Finally, I was uncuffed and allowed to decontaminate by taking a shower.  Over the course of the next 30

days, I sent numerous medical requests complaining of sever shoulder pain to [Defendant] Wise and [Defendant] Singleton both.  The only response I ever received was from Sgt. Langhor via electronic message advising me to 'ask a floor officer for Ibuprofen or Tylenol if I was in pain.'  [Defendant] Wise and [Defendant] Singleton's denial of medical care constitutes deliberate indifference and violate my 8th amendment rights.

(ECF No. 7, pp. 4-7) (errors in original).[3]

## 2. Defendants' Affidavits

Defendants submitted affidavits explaining their version of the use of force on January 7, 2022.  According to Defendant Merchant:

On Friday, January 7, 2022, at approximately 1715 hours, I, [Defendant] Merchant, escorted [Plaintiff] to the bathroom in the intake area for a strip search and to change into a jumpsuit.
Once [Plaintiff] undressed to his boxers, he refused to remove them, stating, 'I'm not going back there naked.'  Based on my experience and training, I recognized this as a potential security risk, as inmates may conceal contraband in their undergarments.
In response, I informed [Plaintiff] that he would not be naked as he would be wearing a jumpsuit.
Following a further verbal exchange, [Plaintiff] demanded to speak to [Defendant] Wise.  I informed him that [Defendant] Wise had left for the day.  In such situations, it's common for inmates to request higher authorities to delay or avoid compliance.  [Plaintiff] then requested to speak to the person in charge.  As [Defendant] Wise had left for the day, I called to [Defendant] Hickey for assistance.  The presence of another higher-ranking officer often helps in de-escalating situations.
Despite several attempts to explain the necessity of removing his boxers for the strip search and due to policy violations (as they were not white), [Plaintiff] refused to comply.  Non-compliance in strip searches can indicate an attempt to hide contraband or weapons, posing a security threat.
[Plaintiff] explicitly stated, 'Mace me, fight me, rip them off, but I'm not taking them off.'  This statement was perceived as a direct challenge to authority and a potential threat to the safety of staff.
I then pulled out my OC spray while giving [Plaintiff] a final warning, stating: 'Take off the boxers or you will be sprayed.'  [Plaintiff] still refused to comply.
I then deployed a short burst of OC spray towards [Plaintiff]'s face, causing him to run away from me to the shower and turn on the water.  This was a clear safety and security threat, as Plaintiff had escalated his resistance from passive to active resistance, by trying to flee.

---

[3] *Hanks v. Prachar,* 457 F.3d 774, 775 (8th Cir. 2006) (per curiam) (noting that, for summary judgment purposes, verified complaint is equivalent to an affidavit).

A loose inmate in the booking area posed a significant safety and security risk to the detention center.

Despite additional commands to remove his boxers, [Plaintiff] continued to refuse. After warning of another spray and receiving no compliance, I entered the shower area and deployed a second short burst of OC spray towards [Plaintiff's] face.

Following the second burst, [Plaintiff] removed his boxers and threw them at [Defendant] Hickey and myself.

I then instructed [Plaintiff] to step out of the shower, during which he attempted to strike me, knocking off my glasses. This action posed an immediate physical threat, requiring a defensive response.

I subsequently restrained [Plaintiff] and, with assistance from [Defendant] Hickey, Deputy Malone, and Deputy Wayne, brought him to the floor and secured handcuffs on him. Such physical restraint is a last resort but necessary when face with physical aggression.

After subduing [Plaintiff], I escorted him back to the shower for the decontamination process.

[Defendant] Hickey then took over, issuing commands to [Plaintiff], who became complaint. Following decontamination, we dressed him in a jumpsuit and escorted him to A-pod, where his handcuffs were removed.

(ECF No. 32-10).

According to Defendant Hickey:

On January 7, 2022, I was on duty and overseeing operations in the area where [Defendant] Merchant was conducting a necessary strip search of [Plaintiff].

[Defendant] Merchant asked me to come over and assist because of [Plaintiff's] non-compliance, I understood the potential security risks involved, such as the possibility of concealed contraband or weapons.

Stationing myself at the restroom doorway, I was prepared to intervene if the situation escalated, as it's crucial to maintain control in such scenarios to prevent potential harm to staff and inmates.

Recognizing the increasing tension, I entered the restroom to assist [Defendant] Merchant.

[Defendant] Merchant made a several attempts to explain the necessity of removing his boxers for the strip search, but [Plaintiff] refused to comply.

[Plaintiff] stated, 'Mace me, fight me, rip them off, but I'm not taking them off.' This statement was perceived as a direct challenge to authority and a potential threat to the safety of staff and other inmates.

After a final warning to remove his boxers or face being sprayed, [Defendant] Merchant prepared his OC spray but [Plaintiff] still refused to comply.

[Defendant] Merchant then deployed a short burst of OC spray towards [Plaintiff's] face, causing him to run away from myself and [Defendant] Merchant. This was a clear safety and security threat, as Plaintiff had escalated his resistance from passive to active resistance, by trying to flee. Despite additional commands to remove his boxers, [Plaintiff] continued to refuse.

After warning of another spray and receiving no compliance, [Defendant] Merchant entered the shower area and deployed a second short burst of OC spray towards [Plaintiff's] face.

Following the second burst, [Plaintiff] removed his boxers and threw them at [Defendant] Merchant and myself.

[Defendant] Merchant then instructed [Plaintiff] to step out of the shower, during which he attempted to strike [Defendant] Merchant, knocking off his glasses.  This action posed an immediate physical threat, requiring a defensive response.

A loose inmate in the booking area posed a significant safety and security risk to the detention center.

[Defendant] Merchant and I subsequently restrained [Plaintiff] and, with assistance from Deputy Malone and Deputy Wayne, brought him to the floor and secured handcuffs on him.

Throughout the incident, my actions were guided by extensive training in correctional security and inmate management, focusing on ensuring the safety of all individuals involved and maintaining the security of the facility.

(ECF No. 32-11).

### 3. Video Footage

The video footage of the incident on January 7, 2022, illustrates Plaintiff walking with Defendant Merchant into a restroom.[4]  The inside of the restroom is out of view from the camera. After approximately one minute, Defendant Merchant opens the door to the restroom and talks with Defendant Hickey.  There is no audio available, so the Court is unable to discern the content of any apparent verbal exchanges.  Defendant Hickey walks away.  Approximately one minute later, Defendant Hickey returns and stands in the doorway of the restroom.  Defendant Hickey enters the restroom and quickly exists.  Defendant Hickey then returns to the booking desk which is in view of the camera to pick up the phone and some sort of hand-held device that is shaped somewhat like a handgun (but clearly was not a handgun).  At the 18:27:11 time stamp, Defendant Hickey returns to the restroom and stands in the doorway holding the device down at his side.  At

---

[4] It is not clear from the video footage that this room is a restroom, but this fact is undisputed by the parties.  (ECF No. 7; ECF No. 32; ECF No. 38).

18:28:25, Defendant Hickey enters the restroom thus leaving camera frame. (ECF Nos. 32-8; 32, pp. 1-2).

Plaintiff and Defendant Hickey return into the camera frame at 18:28:34. Plaintiff is on the floor attempting to crawl out of the restroom while Defendant Hickey is on top of Plaintiff attempting to retrain him. Defendant Merchant then enters the frame from the restroom door and aids Defendant Hickey in his attempt to restrain Plaintiff. Plaintiff is viewed actively resisting and attempts to get away from Defendants Hickey and Merchant for approximately one and a half minutes. During this time, Plaintiff manages to wrestle himself up from the floor and grabs a nearby filing cabinet. A sheriff's deputy then enters the booking area and comes to assist Defendants Hickey and Merchant in releasing Plaintiff's grip on the cabinet and cuffing his hands behind his back. Plaintiff's arms are pulled behind his back to restrain him more than once during this struggle. Plaintiff breaks free from each restraint attempt until the third officer comes to help. Finally, at 18:29:47, Defendants, with the help of the sheriff's deputy, restrained Plaintiff successfully with his hands behind his back and return him to the restroom. The video footage does not show Plaintiff slammed to the ground or hit by Defendants or non-party officers on any part of this body but does not show anything which occurred in the restroom as it was out of the camera frame. (ECF Nos. 32-8; 32, pp. 1-2).

Plaintiff was completely naked during the entire incident save for his socks. At 18:30:18, Defendant Merchant exists the bathroom. Merchant puts his glasses on his face and then sets a cannister on top of the filing cabinets. Defendant Hickey and two unknown sheriff's deputies then enter the restroom and exit again after approximately one minute. After the struggle with Plaintiff, all the officers involved can be seen spitting in a trash can, appearing to clear their throats/cough,

using a mask, and making movements arguably consistent with signs of exposure to OC Spray. (ECF No. 32-8).

At 18:31:29, Defendant Merchant brings what appears to be dishwashing liquid to the restroom and then a towel. Defendant Hickey remains in the restroom with Plaintiff. At 18:37:54, Plaintiff exists the restroom in a jumpsuit with his hands cuffed in front of his body. Plaintiff is given a paper towel, he wipes his eyes, and then appears to get in a verbal exchange with one of the nonparty sheriff's deputies. While the Court is unable to hear the content of the dialogue it appears obvious Plaintiff is agitated and animated in this verbal exchange. Plaintiff paces around the booking area but does not become physical with any of the officers. He then appears to calm down and then stands without appearing to speak. At 18:42:30 the sheriff's deputies exit the booking area and camera frame. Plaintiff appears agitated again at 18:43:05, but then appears to calm down and sits down at the booking bench at 18:43:48. At 18:45:01, Plaintiff is escorted out of the booking area and out of the camera frame. (ECF Nos. 32-8; 23, pp. 1-2).

At no point during the twenty-three (23) minute video does Plaintiff visibility appear injured and the Court does not observe Plaintiff manifest behavior consistent with experiencing pain. (ECF No. 32-8).

### 4. Plaintiff's Deposition Testimony

Defendants submitted Plaintiff's deposition into the summary judgment record. Plaintiff testified, as he claims in his Amended Complaint, that he allowed Defendant Merchant to strip search him and it was only after the search that Plaintiff put his underwear back on. Plaintiff explained he though Defendant Merchant was joking when he said Plaintiff could not retain his underwear if they were not white. (ECF No. 32-9, pp. 26-7). Plaintiff testified Defendant Merchant stated: "This is your last direct order" before spraying him. *Id.* at 27. Plaintiff testified that he

asked to speak with Captain Wise, but Defendant Merchant told him he was acting as captain for

the day and shook his OC Spray. *Id.* Plaintiff says he asked Defendant Merchant to please not

spray him and asked to purchase some underwear. *Id.*

        Plaintiff then testified:

> Without warning, he unleased his pepper spray directly in my face from about five
> feet away. [Defendant] Hickey was in the doorway . . . As soon as the [OC] spray
> hit me, I was terrified. I immediately took off my boxers and retreated to the shower
> that was located about five feet behind me. I took my boxers off, threw them at
> him, and got in the shower to rinse the [OC] spray out of my eyes. When I got in
> the shower, . . . I felt [Defendant] Merchant enter the shower and strike me with a
> closed fist.
> And at that point, I'm completely naked and scared to death. And I run for my –
> all I was thinking is, they're trying to kill me. And I run out because there's no
> camera back there. All that's on my mind is to run into the booking area to get in
> camera view.
> I'm naked, covered in [OC] spray, and wet. So I run past him and [Defendant]
> Hickey. They're both trying to tackle me. I run past both of them and get into the
> booking area where I'm on the jail's camera system. And the first thing I do is grab
> ahold of the first thing bolted down, which was a file cabinet.
> I'm yelling, "Help." I'm scared. They're trying to pull me back into this changing
> area, where there's no camera. They're trying to pull me. And to my knowledge,
> the camera – the video is going to show me completely naked holding onto a file
> cabinet while officers are trying to drag my feet and pry my hands loose from it.
> I'm yelling, "Help. Somebody please help me." And at that time, I see a sheriff's
> deputy in his uniform, and I'm yelling . . . And I'm thinking he's coming to help
> me, and he just comes over and just starts hitting my hands and prying my hands
> loose with them.
> They get me loose. They slam me to the ground. They put handcuffs on me naked
> on the ground behind my back. And it was so crazy because they lifted me off the
> ground, and I'm almost crying. I'm telling them, "Please. My eyes are burning."
> And within 20 seconds of being handcuffed, they unhandcuffed me and they
> allowed me to decontaminate, and that was pretty much it.

(ECF No. 32-9, pp. 26-29).

        When questioned about the alleged closed fist hit to the back of Plaintiff's head, Plaintiff

testified he ran into the shower after he was sprayed with his back to Defendant Merchant while

Plaintiff rinsed. Plaintiff testified: "He kind of half hits me. You know, kind of half hits me but

unmistakably a closed fist, you know.  Enough to jar me . . .."  *Id.* at 40.  According to Plaintiff, Defendants Hickey and Merchant gave no further orders after the OC Spray.  *Id.*

Plaintiff testified that he did not get any medical attention after the January 7, 2022, incident.  *Id.* at 42.  Plaintiff says he was unsure what physical injuries he sustained because he never saw a doctor; Plaintiff testified he might have "neuro problems" but is currently unaware of any.  *Id*. at 43.  Plaintiff's testimony is that his shoulder was in "excruciating pain," but his shoulder was never treated, and it continues to hurt.  *Id*. at 44-45.  Plaintiff testified awareness that his shoulder pain was a "*de minimis*" injury.  (ECF No. 32-9, p. 88).

Plaintiff also testified he did not file a medical request or grievance regarding any injuries until January 15, 2022, and he did not seek medical treatment of any kind while he was released from the HCDC.  (ECF No. 32-9, p. 46).  The January 15, 2022, grievance is the only one Plaintiff filed regarding this incident, but there are many reviews and communications between the HCDC staff and Plaintiff attached to the January 15th grievance.  Plaintiff explained in his deposition that since the HCDC staff never closed out this first grievance, he was prevented from filing any additional grievances.  This is apparently because the system does not permit a new grievance while an open grievance is pending; instead, the only way to lodge complaints is to add notes to the open grievance.  (ECF No.32-9, pp. 56-7).  This, according to Plaintiff, is why he added multiple notes to his January 15th grievance.  *Id.*

Plaintiff testified he asked ever single officer at the HCDC for a form to request medical care including each Defendant in this matter, save and except for Defendant Singleton.  (ECF No. 32-9, p. 65).  After a couple of weeks of being "stonewalled," Plaintiff says he gave up and decided he would get medical treatment when he was transferred to the Arkansas Division of Corrections (hereinafter "ADC").  *Id*. at 66.  The first medical request form Plaintiff received was in August

2022.  *Id.* at 67.  The record is devoid of any evidence Plaintiff requested or received any medical treatment for his shoulder pain once he arrived at the ADC.

With respect to Defendant Singleton, Plaintiff has no evidence that Singleton reviewed his grievance, but Plaintiff says it is hard to believe Singleton was not aware of his requests.  (ECF No. 32-9, p. 54).  Plaintiff asserts Defendant Singleton should have known what was going on in the HCDC.  *Id.*  With respect to Defendant Wise, Plaintiff testified he spoke with Wise regarding the January 7, 2022, incident, and denial of medical care on three occasions prior to Defendant Wise reviewing Plaintiff's grievance on this issue.  (ECF No. 32-9, p. 55-60).  Defendant Wise reviewed Plaintiff' grievance requesting medical care on February 1, 2022 and again on "the 30th." (ECF No. 32-9, p. 61).

### 5.  Grievances and Medical Requests

The record reflects Plaintiff submitted a grievance on January 15, 2022, regarding the use of force on January 7, 2022, and identifies Defendant Merchant and a "john doe deputy sheriff." (ECF No. 32-3, p. 4).  The grievance details are harmonious with allegations he later made in his Amended Complaint and during his deposition.  *Id.*

The record reflects that Plaintiff's grievance was first reviewed by "Rlangohr" on January 16, 2022.  (ECF No. 32-3, p. 5).  On January 28, 2022, Plaintiff responded, stating he was being denied medical attention to his left shoulder, claiming he had been in extreme pain since the incident on January 7, 2022.  *Id.*  On January 28, 2022, "Mevans" reviewed Plaintiff's note.  *Id.* Later that day, Plaintiff responds that it has been two weeks with no response to his grievance.  *Id.* On January 29, 2022, "Rlangohr" reviewed Plaintiff's note, and Plaintiff submitted yet another note, stating his shoulder was causing him extreme pain.  *Id.*  This note was reviewed by "cid614" on February 1, 2022, and "cid614" is identified as Gary Dorman.  *Id.*  Plaintiff submits another

note on this grievance on February 1, 2022, asking why no one will answer his grievance and stating he is attempting to exhaust his administrative remedies. *Id.* In a final note on February 1, 2022, Plaintiff request this grievance and every "add on" be forwarded to his attorney. *Id.* "Rlangohr" reviewed these notes on February 2, 2022, but makes no comment.

On February 3, 2022, Plaintiff adds a note that Defendant Merchant is exhibiting unprofessional misconduct with provoking comments regarding the OC Spray of Plaintiff, and requests his grievance be forwarded to Defendant Singleton. *Id.* Plaintiff added a ninth note on June 9, 2022, asking again why his original grievance would not be answered and why they were "stonewalling" him from filing a lawsuit. *Id.* On June 16, 2022, Plaintiff added a note stating he spoke with Defendant Wise about his original grievance still pending and noting he had explained to Defendant Wise that he could not address any other grievances because of the pending grievance. *Id.* Defendant Wise reviewed this grievance on June 28, 2022.[5] *Id.* at 4.

The record also indicates Plaintiff submitted a "Request Form" on January 29, 2022 stating: "my shoulder is causing me extreme pain after being slammed to the ground by HCDC staff." (ECF No. 32-3, p. 3). The Request was directed to "medical." *Id.* "Rlangohr" reviewed the Request on January 29, 2022 and responded: "FOR ANY MEDICAL ISSUES YOU NEED TO PUT IN A MEDICAL REQUEST. YOU CAN ALSO ASK ANY OFFICER FOR IBUPROFEN OR NON ASPRIN." *Id.* (emphasis in original). "JWise" also reviewed Plaintiff's Request on February 1, 2022. *Id.*

Plaintiff submitted another "Request Form" on January 30, 2022, stating: "my shoulder is in extreme pain! Tylenol and ibuprofen is not helping can I please receive medical attention."

---

[5] There are additional comments and add-ons made by Plaintiff and HCDC staff to his January 15, 2022 Grievance, however, they are unrelated to the claims asserted herein. (ECF No. 32-3).

(ECF No. 32-3, pp. 1-2).  The Request was directed to "medical" and indicates "JWise" reviewed the request on February 1, 2022.  Defendant Wise responded on February 1, 2022 with: "Yes, you can put in a medical request at any time."  *Id.*

Plaintiff also submitted a "Request Form" on February 1, 2022 requesting a medical request form.  This request was directed to Defendant Wise.  It was reviewed by "Rlangohr" on February 2, 2022, and the message states: "ONE WILL TAKEN TO YOU."  (ECF No. 32-3, p. 1) (error in original).

### 6.  Plaintiff's Specific Factual Disputes

Plaintiff makes several factual objections which are necessary to include in the Court's analysis.  Plaintiff disputes Defendant Merchant's statement that Plaintiff refused to remove his underwear for the strip search. As noted above, Plaintiff says he initially removed his underwear for Defendant Merchant to complete the strip search, and then put his underwear back on after the search was complete; only then did the altercation over the color of Plaintiff's underwear begin.  (ECF No. 38, p. 10).  Plaintiff states HCDC has no policy regarding the color of underwear, and he did not refuse to give Defendant Merchant his underwear.  (ECF No. 38, p. 10).  Plaintiff attaches HCDC Policy and Procedure on Issuance of Inmate Uniforms, Linens, and Hygiene Items.  This policy reads in pertinent part:

> . . . To maintain a healthful environment and to protect the personal property of inmates.  All inmates who are to be housed with the general facility population will be required to wear a uniform issued by the [HCDC] . . . After the inmate showers, the Detention Officer will: (1) Return the inmate's personal underwear to him/her . . .

(ECF No. 38, p. 16).  Defendants also agree this is the current policy of the HCDC as they attached it to their Statement of Undisputed Facts.  (ECF No. 32-7).

Plaintiff also denies that Defendant Merchant warned him before spraying him with OC Spray.  Plaintiff then challenges Defendants' assertion he was "fleeing" during the incident as the shower area was directly behind him and a "dead end."  (ECF No. 38, p. 11).  Plaintiff disputes Defendant Merchant's factual assertion that Plaintiff attempted to strike Merchant; to the contrary, says Plaintiff, he posed no physical threat to either Defendants Merchant or Hickey and it was Defendant Merchant that struck Plaintiff in the back of the head.  *Id.*  Plaintiff again alleges he was "slammed" to the ground, detailing that this occurred while he was inside the restroom and before he escaped into the booking area.  *Id.*

Plaintiff references his two medical requests filed on the KIOSK system at the HCDC and the fact that Defendant Wise reviewed both requests and answered one of the requests.  *Id.*  Plaintiff also says Defendant Singleton had knowledge of these requests, but this allegation is not supported with evidence in the summary judgment record.  *Id.*  Plaintiff also disputes the factual assertion that the HCDC's policy for medical requests require the detainees to fill out a "Request Slip" and provide it to a detention officer.  Instead, Plaintiff claims the HCDC had a KIOSK located in each pod for detainees to file medical requests and grievances.  *Id.*

## B.  Claim Two

Plaintiff alleges in Claim Two that Defendant Gully violated his constitutional rights on January 9, 2023, with the use of excessive force, cruel and unusual punishment, and denial of medical care.  (ECF No. 7, p. 9).  Again, the facts are disputed so the Court will provide both party's versions of the incident and summarize the video evidence and deposition testimony.  There are no grievances or medical requests in the record which relate to the January 9, 2023, incident.

### 1.  Plaintiff's Assertions

In his Amended Complaint, Plaintiff states the following with respect to Claim Two:

On 1-9-23 at approximately 1:20 a.m. [Defendant] Gully entered my cell and asked me and my cellmate Joshua Harris "who's beating on the doors?"  We were both asleep when [Defendant] Gully entered.  We both answered "we didn't know." [Defendant] Gully then eyeballed us angrily for about 15 seconds and advised us "if it happens again, I got your ass!"  He then locked our cell door and exited C-pod along with CO John Doe.  Approximately 5 minutes later, [Defendant] Gully reentered my cell.  As I was laying face down on my bed mat on the floor, [Defendant] Gully walked up and unleashed his pepper spray directly in my face and eyes while he stood over me.  I remember hearing him say "I got you bitch" as he sprayed me.  At that point, I quickly got to my feet and went into the POD dayroom in order to get away from [Defendant] Gully and the toxic fumes in our cell.  After maybe 2 minutes, [Defendant] Gully ordered me and my cellmate back into our cell.  After locking our cell door, both [Defendant] Gully and CO John Doe remained in the dayroom as me and my cellmate struggled to breathe and gasped for air in the contaminated confined space of our cell.  After about 5 minutes of persistent coughing, dizziness, shortness of breath, and extreme burning in my eyes and face, [Defendant] Gully finally allowed my cellmate to exit the cell and decontaminate in the POD's shower.  I however was forced to remain locked in my cell and breathe the toxic fumes from the pepper spray.  In fact, I was never allowed out of my confined cell to decontaminate despite repeatedly screaming "please let me decon!"  and "I can't breath!"  At some point I lost consciousness.  I awoke around 8:30 a.m. when Sgt. Cato came to my cell so that he could take me to court. Only then was I finally allowed to shower and decontaminate.  [Defendant] Gully's actions constitute excessive force, cruel and unusual punishment, denial of medical care and violate my 8th Amendment rights.

(ECF No. 7, pp. 9-10) (cleaned up).

Plaintiff asserts his Claim Two against Defendant Gully in both his individual and official

Capacities, and for the official capacity claim, Plaintiff states:

[HCDC] custom of using pepper spray led ultimately to [Defendant] Gully using excessive force against me after he took matters into his own hands when someone allegedly kicked their cell door.

*Id.* at 11.

## 2.  Defendant Gully's Incident Report

Defendant Gully's incident report from January 9, 2023 reads:

At approximately 0123 I [Defendant] Gully radioed Officers Ross and Taylor to respond to C-pod in regards to loud and continuous banging.  Upon arrival of Officers Ross and Taylor [Plaintiff] started to beat on the door again despite being told to cease beating on the door and disrupting the pod.  I [Defendant] Gully along

15

with Officer Taylor then went to c-pod and told a couple inmates to cease the beating including [Plaintiff] and that was their last warning.  As I [Defendant] Gully and Officer Taylor left c-pod [Plaintiff] beat on the door again and dove back on his mat.  At that time I [Defendant] Gully then asked Officer Taylor to open up cell 2 and I [Defendant] Gully gave [Plaintiff] a final warning to cease the banging before deploying a short burst of oc spray into the wall.  [Plaintiff] and Harris was brought out into the day room briefly before returning both to their cell.  [Plaintiff] will remain lock down for the duration of his stay.  No further.

(ECF No. 32-5, p. 2).

There is no affidavit from Defendant Gully in the summary judgment record.

### 3.  Video Footage

The video of the January 9, 2023, incident shows only the dayroom pod outside of Plaintiff's cell.  There is no audio on the video.  Additionally, there is no view of inside Plaintiff's cell or Defendant Gully's spray of the OC Spray.  The video footage first shows a nonparty officer in the dayroom appearing to converse with someone out of the video frame before leaving the pod. Then a different nonparty officer enters the day room and quickly leaves without opening any cell doors.  Several minutes later two officers, Defendant Gully and a nonparty officer return to the pod and open a cell door (not Plaintiff's cell) to converse with the occupants.  The two officers are then seen walking out of the video frame down the dayroom corridor.  (ECF Nos. 32-8; 32, pp. 6-7).

Officers come back into the video frame and open Plaintiff's cell door.  Defendant Gully enters the cell while the nonparty officer stands outside the cell.  The camera cannot view the inside of Plaintiff's cell, but Defendant Gully is inside the cell for less than thirty seconds. Defendant Gully immerges from the cell and both officers leave the pod.  Both officers return to the dayroom and video frame approximately one minute later.  Defendant Gully again enters Plaintiff's cell at time stamp 2:22:20 while the nonparty officer stands outside.  Defendant Gully is inside the cell for approximately six (6) seconds and emerges with Plaintiff at 2:22:26. Plaintiff

16

stands in the dayroom calmly with his hands behind his back.  Plaintiff does appear to cough or clear his throat once right after coming out of the cell.  At 2:22:44, Plaintiff looks directly at the camera and waves.  He does not appear to be coughing; has no visible tears or nasal discharge; and does he exhibit any other signs of distress or discomfort.  Plaintiff and Defendant Gully appear to converse.  Plaintiff's cellmate then comes out of the cell and is coughing and wiping his nose and face.  The nonparty officer takes Plaintiff's cellmate out of the pod while Defendant Gully and Plaintiff appear to continue the conversation.  Both Plaintiff and his cellmate are then returned to their cell approximately 1.5 minutes later.  At 2:23:40, Plaintiff appears to cough before returning to his cell.  At 2:23:57, the officers shut and locked the cell door.  Then the nonparty officer opened the bean hole to the cell door before leaving the pod.  (ECF Nos. 32-8; 32, pp. 6-7).

The nonparty officer can be seen coughing and Defendant Gully is wearing a mask during most of the video footage.  Approximately twelve minutes later, Defendant Gully allows Plaintiff's cellmate out of the cell, and the cellmate leaves the video frame.  Arms can be seen intermittently sticking out of the bean hole of Plaintiff's cell. There is no further video footage of Plaintiff leaving the cell.  (ECF Nos. 32-8; 32, pp. 6-7).

### 4. Plaintiff's Deposition Testimony

Plaintiff explained during his deposition that he was in HCDC as an ADC inmate to appear in court in Hempstead County on January 9, 2023.  (ECF No. 32-9, p. 71).  Plaintiff then testifies to the allegations contained in his Amended Complaint; the Court notes that much of this testimony is not supported by the video evidence.  *Id.* at 71-73.  Plaintiff added that once Defendant Gully left his cell after the first warning to stop beating on the doors, Plaintiff heard the kicking of doors from other cells.  *Id*. at 73.  Five minutes later, Defendant Gully returns to Plaintiff's cell, bent down to Plaintiff's "eye level," said: "I got you bitch," and sprayed Plaintiff in the face with OC

Spray.  *Id*.  Plaintiff also testified, after the spraying, he was coughing along with the entire pod. *Id.* at 79.  No medical treatment was provided to Plaintiff after the spraying.  *Id.* at 80.

The next morning Plaintiff was allowed to do a "half-decontamination" with a short shower before he was taken to court.  *Id.* at 76.  Plaintiff testified that when he arrived in court, his attorney asked, "What the hell happened to you?" because he looked like he had been in a fight without the bruises.  *Id*. at 75.  Plaintiff testified he suffered from burning, itchy, and watery eyes; sinus drainage; and puffy face.  *Id*. at 81.  Plaintiff once again testified as to an awareness that his injuries are "*de minimis*."  *Id.*  at 89.

### 5.  Plaintiff's Specific Factual Disputes

Plaintiff makes several factual disputes in his Response.  Plaintiff disputes Defendant Gully's incident report as Plaintiff states he was asleep both times Defendant Gully entered his cell on January 9th.  (ECF No. 38, p. 12).  Plaintiff also disputes Defendant Gully's statement that he sprayed the wall; Plaintiff says Gully sprayed his face with the OC Spray.  *Id.*  After Defendant Gully put Plaintiff back in his cell, Plaintiff says he struggled to breath and experienced persistent coughing, dizziness, and extreme burning in his eyes and face.  *Id*.  Plaintiff says he repeatedly yelled through his bean hole "I can't breathe," and "please let me decon."  *Id*.  Plaintiff was not allowed out of his cell for approximately six hours after being sprayed.[6]

Plaintiff attached a letter from his attorney, Michael Kaiser, dated September 5, 2023. (ECF No. 38, p. 15).  Unfortunately, the attorney's letter was neither notarized nor sworn under penalty of perjury and the Court unfortunately cannot consider it here as appropriate summary judgment evidence.  *See Alberts v. Willis*, Civil No. 3:20-CV-3008, 2020 WL 7427215, at *5

---

[6] Plaintiff also disputes some of Defendants' factual assertions as to the exact testimony he provided in his deposition.  (ECF No. 38, pp. 7-8).  The Court does not find these factual disputes material as the Court has relied upon its own summary of relevant deposition testimony herein.

(W.D. Ark. Dec. 18, 2020) (citing *Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016) (noting statements that are neither sworn nor made under penalty of perjury may be considered on summary judgment)).[7]

### C.  Official Capacity Claims

Turning to the official capacity claims, with respect to Claim One, Plaintiff's Amended Complaint alleges that:

> Hempstead County Jail's policy of confiscating any/all underwear that "isn't white" led ultimately to Sgt. Merchant, CO Hickey, and Sheriff Deputy John Doe's use of excessive force against me.  Hempstead County Jail's medical policy led to my denial of medical care by Captain Wise and Sheriff Singleton.

(ECF No. 7, p. 6).

With respect to Claim Two, Plaintiff's Amended Complaint contains the following official capacity allegations:

> Hempstead County Jail's custom of using pepper spray led ultimately to [Defendant Gully] using excessive force against me after he took matters into his own hands when someone allegedly kicked their cell door.

(ECF No. 7, p. 11).

Plaintiff testified in his deposition it was Hempstead County's custom or unofficial policy to confiscate all non-white underwear and that this custom caused Defendants Hickey and Merchant to use excessive force against him.  (ECF No. 32-9, p. 91).  Further, Plaintiff testified the HCDC policy on medical requests led to Plaintiff's denial of medical care.  *Id.*

### 1.  HCDC Policy and Procedures

Defendants submitted multiple policies and procedures from the HCDC.

---

[7] In the Order directing Plaintiff's Response to the Motion for Summary Judgment he was specifically advised: "The Affidavit must be based upon the personal knowledge of the person executing the affidavit <u>and must be either</u>: (1) sworn and subscribed to by a notary public; or (2) executed under penalty of perjury, as provided for by 28 U.S.C. 1746."  (ECF No. 33).

Policy 2:13 Inmate Clothing and Personal Property states in relevant part that an HCDC officer will take detainee's personal clothing during book-in and store clothing in the property room. "Personal clothing" is defined as: "shirts, trousers, shoes, belts, hats, suitcases, make-up kits, purses, gloves, coats, socks, ect." (ECF No. 32-7, p. 1). There is no mention of underwear in this policy.

Policy 2:14 Showering provides that all inmates shall be required to shower before being housed with the general population. (ECF No. 32-7). There is no mention of underwear in this policy.

Policy 2:15 Strip Search states, in pertinent part, that the admitting officer shall determine if a strip search is necessary. After the detainee has showered, the officer will conduct the strip search. The Policy provides detailed instructions on how to conduct the strip search. Then the Policy specifically states:

> If the inmate refuses to submit to a strip search, the Detention Officer will attempt to verbally persuade the inmate and, failing that, the Detention Officer will: 1. Place inmate in a holding cell till the search is completed.

(ECF No. 32-7, p. 5).

Policy 4:09 addresses use of chemical weapons, specifically Oleoresin Capsicum ("OC Spray"), and reads in pertinent part:

> The use of the [OC Spray] is intended solely as a control device. To enable the officer to carry out his or her duties in the safest, most efficient and professional manner with the least chance of injury or harm to either the officer or inmate.
> …
> [OC Spray] may be utilized anytime an officer feels that its use will reduce the likelihood of injury to either the officer or the inmate.

> The use of [OC Spray] falls along the use of force continuum between 'verbal commands' and actual 'hands-on' use of force when resistance is encountered.

> The basic outline is as follows for use of force:

     a.   Physical presence
     b.   Verbal warning
     c.   Verbal command
     d.   Chemical weapon
     e.   Hands-on control
     f.   Impact weapon
     g.   Deadly force

Example . . . If by word or action the inmate shows no intention of compliance, the use of the chemical weapon is the next logical step.  This should, in most cases, eliminate the need for actual hands-on active countermeasures and the possibility of officer/inmate injury.

The chemical weapon is not, under any circumstances, to be used as 'punishment,' or as a coercive tool once an inmate is under control.

…

Inmates subdued through the use of OC [Spray] shall be taken to a wash-up area prior to any further processing. . . .

(ECF No. 32-7, pp. 7-8).

Finally, Policy 6:01 Medical Services and 6:04 Non-Emergency Care & Daily Medical

Complaints reads in pertinent part:

The Hempstead County Detention Facility inmates can make medical complaints daily for review by qualified medical personnel to ensure appropriate medical attention. . . .

Inmate requests for medical care shall be documented on the Request Slip.  The slips shall be provided by the Detention Officer upon request and shall be collected the day requested.

. . .

The Detention Officer shall immediately forward these slips to the ranking officer on duty.  All requests for medical care shall be relayed to the Facility Physician via telephone.  The Facility Physician's instructions shall be followed, and cases shall be referred according to the Facility Physician's instructions: 1.  to the Facility Physician's Officer for treatment, 2. to the appropriate Hospital Emergency Room for immediate treatment, [or] 3. to the regularly scheduled sick call visit by the Facility Physician.

(ECF No. 32-7, p. 11). [8]

---

[8] The Policy and Procedures submitted also have two pages which appear to be out of order and only partial policy and procedures.  *See* (ECF No. 32-7, p. 6) and (ECF No. 32-7, p. 9).  The Court did not find any relevant information in these misplaced pages.

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607. "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities. The type of conduct that is actionable and the type of defense available depend on whether the claim is asserted against a defendant in his official or individual capacity. *See Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal citations omitted). "Claims against individuals in their official capacities are equivalent to claims against the entity for which they

work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." *Id.* Personal capacity claims "are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense" to these individual capacity claims. *Id.* To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law, and that the actor violated a right, privilege, or immunity secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

### III. DISCUSSION

Defendants argue (1) Defendants Wise and Singleton had no personal involvement in Plaintiff's claimed constitutional violations and cannot be held liable on a theory of *respondeat superior*; (2) the force used against Plaintiff on January 7, 2022 was objectively reasonable; (3) Defendants did not deliberately disregard an objectively serious medical need of Plaintiff after the use of force on January 7, 2022; (4) Defendant Gully did not maliciously and sadistically use force against Plaintiff on January 9, 2023; (5) Defendant Gully did not deliberately disregard an objectively serious medical need of Plaintiff on January 9, 2023; (6) Plaintiff suffered no physical injury and should be limited to nominal damages;[9] (7) Defendants are entitled to qualified immunity; and (8) there is no basis for official capacity claims. (ECF No. 31).

---

[9] Defendants also argue Plaintiff has failed to show anything more than *de minimis* injury. Therefore, he is only entitled to nominal damages even if he is successful on the merits of his claims. (ECF No. 31, p. 37). Damages is not an issue for summary judgment. The Court will address this issue later should it become necessary.

For its analysis, the Court will consider the following claims: (1) an excessive force claim for use of force on January 7, 2022; and (2) denial of medical care related to injuries from January 7, 2022 incident which are part of Claim One, along with (3) an excessive force claim for the use of force on January 9, 2023; and (4) denial of medical care related to injuries on January 9, 2023 which are part of Claim Two.  With respect to Claim One's excessive force allegations, Plaintiff describes two distinct uses of force – the OC Spray and the physical force used to restrain Plaintiff following the spray – alleging both were excessive and triggering individual review of each.  The Court notes that, with respect to Claim Two, Plaintiff makes allegations only against Defendant Gully.  (ECF No. 7, pp. 5, 9).  Each is addressed below.

## A.  *Respondeat Superior*

Defendants contend Plaintiff's evidence fails to illustrate that either Defendant Wise or Singleton were personally involved in any of his claims arising on January 7, 2022.  (ECF No. 31, p. 3).  Defendants are correct that neither Wise nor Singleton can be held liable under Section 1983 simply because they are the jail administrator of the HCDC and sheriff of Hempstead County, respectively.  A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone County Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as *respondeat superior* or supervisor liability.") (internal quotations omitted); *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability).

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights."  *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)).

There is no evidence demonstrating Defendant Singleton was directly involved in the use of force against Plaintiff on January 7, 2022, or participated in the lack of medical care subsequent to that incident.  Plaintiff admits in his deposition that he had no evidence of Defendant Singleton's involvement but argues Singleton should have known what was happening in the HCDC as he was the sheriff.  (ECF No. 32-9, p. 54).  This is insufficient, as a matter of law, to establish supervisory liability.  For this reason, Plaintiff's Claim One regarding the January 7, 2022, use of force and denial of medical care as alleged against Defendant Singleton, in his individual capacity, fails as a matter of law.

Likewise, it is undisputed that Defendant Wise was not present at the HCDC on January 7, 2022, when the force was used against Plaintiff by Defendants Merchant and Hickey.  (ECF No. 38).   There is evidence in the record that Defendant Wise had any knowledge of or participation in the force used against Plaintiff on that date.  There is evidence, however, that Defendant Wise was involved in the review of Plaintiff's grievances and medical requests regarding the January 7, 2022, incident.  Plaintiff testified that he personally spoke with Defendant Wise on three occasions regarding his medical request and the fact it was unanswered, (ECF No. 32-9, p. 57), and the record reflects Defendant Wise reviewed Plaintiff's grievance concerning his inability to receive medical care. (ECF No. 32-3, p. 4).   For these reasons, Plaintiff's Claim One regarding the use of excessive force on January 7, 2022, against Defendant Wise, in his individual capacity, also fails as a matter

25

of law.   Plaintiff's denial of medical care claim against Defendant Wise, however, warrants consideration on the merits as Plaintiff has presented evidence indicating Defendant Wise was aware of Plaintiff's medical requests/grievances and reviewed them.   The Court will address Plaintiff's denial of medical care claim against Defendant Wise hereinbelow.

### B.  Use of Force

Defendants do not deny force was used against Plaintiff on January 7, 2022, by Defendants Merchant and Hickey, and again on January 3, 2023, by Defendant Gully.   Defendants argue that Plaintiff's constitutional rights were not violated because (1) the force used by Defendants Merchant and Hickey on January 7, 2022, was objectively reasonable, and (2) the force used by Defendant Gully on January 3, 2023, was not maliciously or sadistically imposed.[10]   Because Plaintiff was a pretrial detainee in 2022 and a convicted inmate in 2023, the Court analyzes these claims under two separate standards – Claim One (January 7th) under the Fourteenth Amendment and Claim Two (January 3rd) under the Eighth Amendment.

### 1.  Claim One – Use of Force on January 7, 2022

The Fourteenth Amendment's objective reasonableness standard applies to the use of force against a pretrial detainee.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).  This is the same objective reasonableness standard that applies to arrestees under the Fourth Amendment. *See Andrewes v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).  "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove."  *Kingsley,* 576 U.S. at 395.  A pretrial detainee

---

[10] Defendants also contend – with respect to both excessive force claims – that Plaintiff suffered only *de minimis* injuries (if any) because of both uses of force.   This argument fails, however, as *de minimis* injuries alone cannot defeat a claim for excessive force.  *See Chambers v. Pennycook*, 641 F.3d 898, 901 (8th Cir. 2011).

"must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-7.

The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Additionally, "[a] court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). "[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> The reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective. *Id.* at 398-99.

In Claim One, Plaintiff alleges Defendants Merchant and Hickey used excessive force against him on January 7, 2022, when Defendant Merchant sprayed him with OC Spray; when Merchant hit him in the back of the head; and when both Defendants Merchant and Hickey twisted his arms behind him and slammed him to the ground. While many facts surrounding the use of force are disputed, there is video footage of a portion of the incident that clarifies the incident in

Case 4:23-cv-04002-SOH   Document 40   Filed 07/01/24   Page 28 of 44 PageID #: 507

some respects.  As predicted above, the Court analyzes the use of OC Spray separately from the use of physical force on Plaintiff.

### a.  OC Spray

Defendants argue Defendant Merchant's use of OC Spray was objectively reasonable because (1) Plaintiff was resisting a lawful order; (2) was given a warning prior to the spray; (3) Defendant Merchant used only a limited amount of OC Spray; (4) Defendant Merchant complied with HCDC policy; and (5) Plaintiff suffered no injury from the OC Spray.  (ECF No. 31).

The amount of OC Spray used is not a disputed fact, nor is the fact Plaintiff did not suffer any permanent injury from the OC Spray.  (ECF No. 38).  Highly contested, however, is Defendant Merchant's statement that he warned Plaintiff; Plaintiff says Merchant did not warn him before spraying him with OC Spray.  (32-7, p. 11).  Plaintiff also disputes whether Defendant Merchant's order to remove his underwear was a "lawful order" since HCDC had no written policy requiring detainees wear only white underwear.  *Id.* at 10, 16.  Plaintiff also disputes any characterization that he posed a security risk to the HCDC, i.e., whether a reasonable officer would view Plaintiff as a security risk considering the totality of the circumstances.

Defendant Merchant says HCDC security was at risk because Plaintiff refused to comply with a strip search prior to being booked as is required by HCDC policy.  (ECF No. 32-10).  Recall, however, that Plaintiff says he complied with the strip search and then put his underwear back on after the search was complete.  According to Plaintiff, it was his nonwhite underwear that prompted Defendant Merchant's order to remove them.  (ECF No. 32-9, pp. 26-27).  The undisputed record indicates HCDC has no policy prohibiting colored underwear, (ECF No. 38, p. 16) but does have a policy on strip searches dictating that Plaintiff should have been placed in a holding cell if he refused his strip search. (ECF Nos. 32-7, p. 5).  No one disputes that prior to Defendant Merchant's

use of OC Spray, Plaintiff was neither fleeing nor resisting restraint, but he was refusing an order to remove his underwear.  (ECF No. 32-10; ECF No. 38).

Given this summary judgment record, the Court is unable to determine, as a matter of law, whether Defendant Merchant's OC Spray of Plaintiff was an objectively reasonable use of force. *See Kingsley*, 576 U.S. at 397-99.  On the one hand, if Plaintiff refused Defendant Merchants' attempts to conduct the required strip search, Plaintiff could be viewed as a recalcitrant inmate posing a security risk to the HCDC, perhaps warranting use of the OC Spray to ensure the safety and security of the HCDC.  *See e g., Stanley v. Gray,* Civil No. 4:22-CV-4036-SOH, 2023 WL 6397834 at *7 (W.D. Ark. Sept. 28, 2023) (holding the brief spraying of a pretrial detainee, without warning, for refusing to enter a suicide watch cell and walking away from the officer while unrestrained was a constitutionally permissible use of force on a "recalcitrant" inmate) (citing *Jones v. Shields,* 207 F.3d 491, 495-7 (8th Cir. 2000); *Perry v. Gray*, Civil No. 4:07-CV-4013-HFB, 2008 WL 4191641, at *1 (W.D. Ark. Sept. 10, 2008) (explaining the law in the Eighth Circuit allows prison officials to utilize non-lethal chemicals for the purpose of controlling a recalcitrant inmate and applying this standard to a pretrial detainee that refused an order to remove a blanket from the cell pod camera when ordered to do so and jumped up from a table in the pod when the spraying officer entered) (citing *Jones,,* 207 F.3d at 496).  If, on the other hand, Plaintiff's testimony is believed by a jury, Plaintiff had complied with HCDC policy and participated in the strip search, rendering Defendant Merchant's order to Plaintiff to remove his underwear as outside of HCDC policy and arbitrary.  Under this version of facts, Defendant Merchant's did not further any legitimate government interest, much less the security of the HCDC or the safety of himself and Plaintiff, and the jury could find such use of force excessive.  *See Ramirez v. Ferguson,* Civil No. 08-CV-5038-ELS, 2011 WL 1157997, at *14-15 (W.D. Ark. Mar. 29, 2011) (holding the use

of pepper spray on a noncompliant pretrial detainee was excessive when used simply because the detainee could not comply with order while intoxicated in a lockdown cell); *Thomas v. Byrd*, Civil No. 4:08-CV-03840-SWW/BD, 2009 WL 4546666 at *10 (E.D. Ark. Nov. 30, 2009) (holding "[n]oncompliance alone is an insufficient justification to pepper spray a nonthreatening pretrial detainee in the face and eyes" when the detainee dressed slowly in his uniform and then refused to put down a bar of soap after being ordered to do so).  Based on these disputed facts, the Court cannot determine, as a matter of law, whether Defendant Merchant's actions in spraying Plaintiff was objectively reasonable under *Kingsley,* 576 U.S. at 398-99.  Nevertheless, Defendant Merchant has asserted qualified immunity, and may still be entitled to dismissal if the law is not clearly established to show that his use of OC Spray violated Plaintiff's constitutional rights.

Qualified immunity "shields [a] government official from liability in a section 1983 action unless the official's conduct violates a clearly established right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 335 (1986).  "At summary judgment, qualified immunity shields a law enforcement officer from liability in a § 1983 action unless: (1) the facts viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Watson v. Boyd,* 2 F.4th 1106, 1109 (8th Cir. 2021) (internal citation and quotations omitted).

For purposes of qualified immunity, the Court looks to the law at the time of the incident – January 2022.  The Supreme Court has cautioned that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal citation and quotation omitted).  A right is clearly established if it is sufficiently clear for every reasonable

official to understand the actions would violate a constitutional right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotations omitted). The case precedent must not be directly on point, but it must place the constitutional question beyond debate. *White*, 580 U.S. at 79 (internal citation and quotation omitted).

In 2022, it was clearly established in the Eighth Circuit that force in excess of what is necessary to achieve institutional interest such as safety, security or efficiency constitutes punishment of a pretrial detainee. *See Johnson -El v. Schoemehl*, 878 F.2d 1043 (8th Cir. 1989). Furthermore, it was clearly established that Plaintiff, as a pretrial detainee, was entitled to be free from objectively unreasonable uses of force. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015). "It is clearly . . . established that force may be justified to make an inmate comply with a lawful prison regulation or order, but only if the inmate's noncompliance also poses a threat to other persons or to prison security." *Thomas v. Byrd*, Civil No. 4:08-CV-03840-SWW/BD, 2009 WL 4546666 at *11 (E.D. Ark. Nov. 30, 2009) (citing *Treats v. Morgan,* 308 F.3d 868, 875 (8th Cir.2002) (citing *Lawrence v. Bowersox,* 297 F.3d 727, 732 (8th Cir.2002); *Jones v. Shields,* 207 F.3d 491, 496–497 (8th Cir.2000); *Hickey v. Reeder,* 12 F.3d 754, 759 (8th Cir.1993); *Stenzel v. Ellis,* 916 F.2d 423, 426–427 (8th Cir.1990)).

Accordingly, Defendant Merchant is not entitled to qualified immunity at this juncture since the record remains unclear as to whether Plaintiff posed any security or safety risk prior to Defendant Merchant's use of OC Spray. Plaintiff's Claim One excessive force claim against Defendant Merchant for the use of OC Spray on January 7, 2022, should survive summary judgment.

### b. Physical Force

The Court now turns to Plaintiff's claim that Defendants Merchant and Hickey's used excessive physical force against him on January 7, 2022.  Plaintiff complains he was hit in the back of the head, slammed to the floor, beat on the hands, and had his arms twisted behind his back. (ECF No. 7).  Defendants argue Plaintiff began to actively resist and flee once the OC Spray was deployed, drastically changing the circumstances.  Defendants argue the need for physical force was apparent due to the security risk posed by a fleeing and resisting Plaintiff, clothing as objectively reasonable under *Kingsley* these officers use of physical force. (ECF No. 31).  Here, the Court agrees.

The same Fourteenth Amendment standard under *Kingsley* applies to this use of physical force as the OC Spray.   Many of the facts related to this use of force are disputed, and the video footage captured most of the complained physical force.  Accordingly, the Court will only consider Plaintiff's version of events that are not blatantly contradicted by the video evidence.  *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (explaining a court should not adopt the version of events presented by the nonmoving party when that version is blatantly contradicted by video footage on the record).   For example, Plaintiff claims Defendant Merchant "half-hit" him in the back of the head once he fled away from Defendant Merchant into the shower.  (ECF No. 32-9, p. 40).  The video did not capture this use of force, so the Court views this allegation disputed.

The video footage, however, provides extensive evidence of Plaintiff actively and aggressively resisting and attempting to escape the attempts of Defendants Merchant and Hickey to restrain him.  This visible resistance appears to be a continuation of Plaintiff's attempts to flee and resist Defendants Merchant and Hickey while inside the restroom. The video contradicts

Plaintiff's claims that he was slammed to the floor.[11] or that any Defendant or nonparty beat his hands.  Defendant Hickey can be seen placing his hand on top of Plaintiff's while he is holding on to the filing cabinet, but it is not forceful.  Plaintiff is never slammed to the floor.  (ECF No. 32-8; ECF No. 32, pp. 1-2).  The video demonstrates that even after Plaintiff is subdued and restrained, he continues to display agitation.  *Id.*

The Court finds, based on the record before it, that the use of physical force by Defendants Hickey and Merchant was objectively reasonable given the totality of the circumstances.  Not ever push, shove, or hit, even if it may later seem unnecessary upon judicial review, violates the detainee's constitutional rights.  *See Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1081-82 (8th Cir. 1990) (applying the Fourth Amendment objectively reasonable standard to an arrestee).[12]  Once Plaintiff fled from Defendants Merchant and Hickey, he became a security risk to the HCDC and put himself, Defendants Merchant and Hickey, the nonparty officers, and other HCDC detainees or inmates in some amount of danger.[13]  Such a security and safety risk is certainly a legitimate governmental interest.  *See Kingsley*, 576 U.S. at 397-9; *see also Bell v. Wolfish,* 441 U.S. 520, 546-7 (1979) (ensuring the safety of inmates and detainees in confinement

---

[11] The Court notes Plaintiff first alleged he was slammed to the floor after being pried loose from the filing cabinets in his Amended Complaint.  (ECF No. 7, pp. 4-7).  Then he makes the same allegation in his deposition testimony.  (ECF No. 32-9, pp. 26-29).  However, later in his Response to Defendants' Motion, Plaintiff alleges he was slammed to the floor while still inside the restroom which was outside of the video frame.  (ECF No. 32-7).  Even if Plaintiff was in fact slammed to the ground inside the restroom it would not change the Court's analysis as Plaintiff has admitted he was actively resisting and attempting to get away from Defendants Merchant and Hickey at the time.  (ECF No. 7; ECF No. 32-9).  The Court finds an objectively reasonable officer in Defendant Merchant and Hickey's position would take him to the floor to subdue him.
[12] As previously explained, the Fourteenth Amendment standard applied here is the same objective reasonableness standard as that applied to arrestees under the Fourth Amendment.  *See Andrewes v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).
[13] At least four other inmates can be viewed on the video footage, walking into the booking area where Plaintiff wrestles with Defendants during this incident.  (ECF No. 32-8; ECF No. 32, pp. 1-2).

is a legitimate penological interest). Moreover, Defendants Merchant and Hickey's response to that risk was objectively reasonable. *See Ryan v. Armstrong*, 850 F.3d 419, 427-8 (8th Cir. 2017) (holding the force used to retrain a resisting pretrial detainee by placing body weight on the detainee while he was on the ground and deploying a taser twice, to subdue the resisting detainee inside his cell was objectively reasonable even though the detainee died after the encounter).

Furthermore, Plaintiff's *de minimis injuries* – when viewed along with the totality of the circumstances – leads the Court to believe that the amount of force used, even that force which is not viewable on the video footage, was proportionate to the safety and security risk Plaintiff posed. *Kingsley*, 576 U.S. at 397-9; *see also Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019) ("A de minimis use of force is insufficient to support a claim, and it may well be that most plaintiffs showing only de minimis injury can show only a corresponding de minimis use of force."); *Foster v. Metro Airports Comm'n.,* 914 F.2d 1076, 1082 (8th Cir. 1990) (holding allegations of pain from being handcuffed without some evidence of more permanent injury were insufficient to support an excessive force claim).

Accordingly, under the totality of circumstances, the Court finds no jury could find Defendants Merchant and Hickey's physical actions to attempt to regain control of Plaintiff were objectively unreasonable applications of force and this claim should be dismissed as a matter of law.

### 2.  Claim Two – Use of Force on January 9, 2023

In Claim Two, Plaintiff alleges Defendant Gully violated his constitutional rights when he sprayed him in the face with OC Spray on January 9, 2023. (ECF No. 7). Defendant Gully argues he did not maliciously and sadistically use force against Plaintiff. (ECF No. 31). As explained

above, because Plaintiff was a convicted inmate on January 9, 2023, the Eighth Amendment right to be free from cruel and unusual punishment governs the excessive force alleged in Claim Two.

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Burns v. Eaton*, 752 F.3d 1136, 1138 (8th Cir. 2014) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). In evaluating an excessive force claim under the Eighth Amendment, the relevant inquiry is whether the force used was applied in a good-faith effort to maintain or restore discipline or was used to maliciously and sadistically to cause harm. *See U.S. v. Miller*, 477 F.3d 644, 647 (8th Cir. 2007). The infliction of pain during a prison security measure does not amount to cruel and usual punishment simply because it may appear, in hindsight, that the degree of force applied for security purposes was unreasonable or unnecessary in the strict sense. *Burns v*, 752 F.3d at 1138-9 (8th Cir. 2014). This standard is different and less protective than the standard applied to arrestees or pretrial detainees under the Fourth Amendment. The Fourth Amendment standard does not consider the officer's underlying intent, "whereas the subjective motivation of the individual officers are of central importance in deciding whether force was used maliciously and sadistically to cause harm in violation of the Eighth Amendment." *Id.* at 1139 (internal quotations and citations omitted).

The facts are disputed surrounding the January 9, 2023, use of OC Spray, and the video footage did not record the alleged spraying but did record Plaintiff directly after the spraying. While some of the facts are disputed, when the Court considers the facts as allegedly by Plaintiff that are not blatantly contradicted by the video evidence, Plaintiff's excessive force claim fails as a matter of law. *See Scott v. Harris*, 550 U.S. at 380.

Taking Plaintiff's allegations as true, Defendant Gully entered his cell, asked if he was beating on the door, and threatened him if he did not stop the beating. (ECF No. 7, pp. 9-10).

These actions along with Defendant Gully's incident report clearly demonstrate Defendant Gully believed Plaintiff was banging on the door and disrupting the pod.  (ECF No. 32-5, p. 2).  While Plaintiff disputes the fact that he was in fact banging on the door, he does not dispute Defendant Gully's belief that Plaintiff was the culprit.  (ECF No. 38).  Based on Defendant Gully's undisputed belief, Defendants argue the evidence does not support a finding that Defendant Gully used the OC Spray maliciously and sadistically to cause Plaintiff harm, but instead, used the spray to restore and maintain discipline in the HCDC.  *See Hudson v. McMilliam,* 503 U.S. 1, 6-7 (1992).  The Court agrees.

Defendant Gully ordered Plaintiff to stop banging on the door prior to returning and spraying Plaintiff.  Regardless of whether that order was based on an incorrect belief that Plaintiff was the culprit of the disruption in the pod, Defendant Gully was following the HCDC use of chemical weapon policy by first giving a verbal command.  (ECF No. 32-7, pp. 7-8).  When the banging continued, as is undisputed by Plaintiff, Defendant Gully then returned and deployed the OC Spray.  (ECF No. 32-9, p. 73),

The Eighth Circuit is clear that use of OC Spray to control a recalcitrant inmate is an acceptable use of force.  *Jones*, 207 F.35 at 496.  Plaintiff has not presented any evidence to illustrate that Defendant Gully's intent was to maliciously or sadistically cause him harm instead of restoring discipline in the HCDC.  While unfortunate that Plaintiff was mistakenly identified as the disruptor, Defendant Gully's mistaken belief negates any malicious and sadistic motives in Defendant Gully's use of the OC Spray.  Accordingly, based on this summary judgment record, a jury could not find Defendant Gully's use of OC Spray was maliciously and sadistically deployed in violation of Plaintiff's Eighth Amendment rights.  *See Burns,* 752 F.3d 1136 (8th Cir. 2014).

In so deciding, the Court does not disregard the fact that Plaintiff was not allowed to shower and decontaminate after the spraying.  Instead, the Court finds the video evidence blatantly contradicts Plaintiff's allegation he was sprayed directly in the face with the OC Spray – thus, negating a need to decontaminate.  When Plaintiff walked out of his cell immediately following the use of OC Spray inside his cell, he shows no signs of being sprayed directly in the face. Plaintiff walks out with his hands behind his back and looks directly at the camera and waves. This angle provides a clear view of Plaintiff's face which is not red and is free from tears and nasal discharge; Plaintiff shows no visible sign of irritation.  Furthermore, Plaintiff never rubs or wipes his face, never sneezes, and only coughs two short throat clearing coughs while on camera.  (ECF Nos. 32-8; 32, pp. 6-7).  Without more, the Court finds no reasonable jury could conclude Plaintiff needed decontaminating.  *See Scott*, 550 U.S. at 380.

### C.  Claim One and Two - Denial of Medical Care

Plaintiff alleges denial of medical care claim under both Claim One and Two.  Unlike the excessive force analysis, courts in the Eighth Circuit analyze denial of medical care claims for pretrial detainees and convicted inmates under the same standard:  the deliberate indifference standard of the Eighth Amendment.  *See e.g., Morris v. Cradduck*, 954 F.3d 1055 (8th Cir. 2020) (pretrial detainee has the same rights to medical care under the Due Process Clause as an inmate has under the Eighth Amendment).

To succeed on a denial of medical care claim, Plaintiff must demonstrate (1) that he had an objectively serious medical need, and (2) that the Defendants actually knew of, but deliberately disregarded, that serious medical need.  *See Ivey v. Audrain Cty., Mo.*, 968 F.3d 845, 848 (8th Cir. 2020).  "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for

a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (internal quotations omitted). "To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the [detainee's] health." *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (internal quotations and citations omitted). The Eighth Circuit has stated that this "onerous standard requires a showing more than negligence, more than even gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (internal quotations and citations omitted).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. Cty. of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis[,]" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (internal quotations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub v. VonWald*, 638 F.3d 905, 919 (8th Cir. 2011) (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *see also Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (holding a three-week delay, "coupled with knowledge of inmate-patient's suffering, can support a finding of an Eighth Amendment violation").

### 1. January 7, 2022

In Claim One, Plaintiff alleges Defendants Merchant, Hickey, and Wise denied him medical care for his shoulder after the January 7, 2022, incident.[14]  Defendants argue Plaintiff has failed to show he suffered from an objectively serious medical need and cannot show any constitutional violation for a denial of medical care.  The Court agrees.

First, the summary judgement record does not show Plaintiff suffered from an objectively serious medical need related to his shoulder.  *See Aswegan v. Henry,*  49 F.3d 461, 464 (8th Cir. 1995) (holding that the plaintiff's bare assertion of a medical need without medical evidence or an injury or conditions so obvious that a layperson would recognize needed treatment was insufficient to state a denial of medical care claim); *Holden v. Hirner*, 663 F.3d 336, 342-3 (8th Cir. 2011) (holding a dental pain without outward and obvious signs such as swelling, bleeding, or inability to eat would not be obvious to a lay person as an objectively serious medical need).  The record is devoid of any outward or obvious symptoms of any shoulder injury other than Plaintiff's complaints of pain. (ECF No. 38, 17-20); (ECF No. 32-9, p. 60).  It is undisputed that Plaintiff was treated with pain medication, i.e., Tylenol and Ibuprofen.  (ECF No. 23-3, pp. 1-2).  Therefore, Plaintiff cannot show any Defendant was deliberately indifferent to a potential medical need if one in fact existed.  While Plaintiff did not receive an examination – and perhaps not the medical treatment Plaintiff wished to receive for his shoulder pain – the law is clear that Plaintiff is entitled to adequate medical care, not the specific medical care of his choice.  *Meuir v. Greene County Jail Employees,* 487 F.3d 1115, 1118-19.

---

[14] Plaintiff also asserts this claim against Defendant Singleton, but as the Court has already found Plaintiff failed to allege any personal involvement of Defendant Singleton in any claims, s*upra,* p. 24-25, it need not address such claim here.

The undisputed record reflects that Plaintiff was released three (3) days after the January 7, 2022, use of force incident but then reincarcerated three days following his release. There is no evidence Plaintiff sought medical care for his shoulder while he was in the free world. (ECF No. 32-9, p. 46; 61). Plaintiff is currently incarcerated in the ADC and has failed to produce any evidence that he sought or received any medical treatment for his shoulder while incarcerated in the ADC. The video evidence illustrates Plaintiff walking around the booking area of the HCDC after this January 7th encounter without any visible indication of injury, (ECF No. 32-8) and when questioned during his deposition, Plaintiff acknowledges his physical injuries were minor. (ECF No. 32-9, p. 88). This record does not support a finding of an objectively serious medical need or deliberate indifference to Plaintiff's alleged pain. For these reasons, the Court finds, as a matter of law, that Plaintiff has failed to state a denial of medical care claim against Defendants Merchant, Hickey, and Wise.

### 2. January 9, 2023

In Claim Two, Plaintiff alleges Defendant Gully unconstitutionally denied him medical care. Defendants again argue Plaintiff has failed to show an objectively serious medical need, and thus, cannot show any constitutional violation for a denial of medical care. The Court agrees.

The same legal standard applies, and Plaintiff must first demonstrate that he had an objectively serious medical need after the January 9, 2023, OC spraying. *See Ivey,* 968 F.3d at 848. Plaintiff's bare assertion he suffered a serious medical need after the January 9, 2023 spraying is insufficient. *See Aswegan,* 49 F.3d at 464. While Plaintiff testified that he suffered from coughing, trouble breathing in his cell, dizziness, and extreme burning in his eyes and face immediately following the spraying, (ECF No. 38, p. 12), the video evidence directly contradicts these allegations by Plaintiff. Plaintiff is seen immediately following the incident with no signs

of distress.  (ECF Nos. 32-8; 32, pp. 6-7).  The Court need not find an issue of fact when evidence on the record, such as a video, dispels such dispute.  *See Scott,* 550 U.S. at 380.

Furthermore, the record is devoid of any evidence Plaintiff requested medical care following the January 9, 2023, incident.  Plaintiff was released from the HCDC on January 10, 2023 – the day after the incident – back into the custody of the ADC.  As with Claim One, the Court finds it notable that Plaintiff did not seek any medical care once he returned to the ADC. This record – containing only Plaintiff's allegations – cannot support this Court finding of an objectively serious medical need.   For these reasons, the Court concludes Plaintiff's denial of medical care related to the January 9, 2023, incident fails as a matter of law.

### D.  Official Capacity Claims

Plaintiff has alleged an official capacity claim against all Defendants for both the excessive force and denial of medical care claims.  Specifically, Plaintiff claims the policies of the HCDC regarding medical requests caused his denial of medical care; claims the unofficial policy or custom of requiring white underwear caused Defendants Merchant and Hickey to use excessive force against Plaintiff; and claims the HCDC policy caused Defendant Gully to use excessive force against him through the OC Spray.  (ECF No. 7).  Defendants argue that none of these allegations are sufficient to establish official capacity claims.  (ECF No. 31, p. 40).

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). In this case, Plaintiff's official capacity claim against Defendants is treated as a claim against Hempstead County.  *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor."  *Atkinson v. City of*

*Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish Hempstead County's liability under Section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). Here, this means Plaintiff must produce summary judgment evidence to show a policy or custom of Hempstead County contributed to his claimed constitutional violation – excessive force.

Defendants first argue Hempstead County policies cannot be the moving force behind a constitutional violation that did not occur. (ECF No. 31, p. 40). The Court agrees but only with respect to Plaintiff's denial of medical care claims and Plaintiff's excessive force claim against Defendant Gulley. Because the Court has determined the record does not support any cognizable constitutional violations regarding those claims, there can be no corresponding official capacity claims. *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (The Eighth Circuit has consistently recognized without an underlying substantive constitutional violation against a defendant in their individual capacity, a plaintiff cannot be successful on an official capacity claim against that defendant's employer). Accordingly, all of Plaintiff's official capacity denial of medical care claims and his official capacity excessive force claim against Defendant Gulley should be dismissed as a matter of law.

Regarding the alleged unofficial policy or custom of Hempstead County requiring only white underwear, Defendants argue it is constitutionally permissible for the HCDC to have uniform color requirements. (ECF No. 31, p. 41). Defendants have not, however, presented any evidence that such a policy or custom actually exists at the HCDC. Plaintiff, too, has problems of proof in this regard – he has also failed to present any evidence of a policy requiring only white underwear exists at the HCDC, alleging only that Defendant Merchant told him he could only wear

white underwear before spraying him with OC Spray.  The record supports a conclusion that HCDC did not have a white underwear only policy.  (ECF No. 38, p. 16).  As a result, Plaintiff can only base his official capacity claim here on a "custom" of the HCDC and to establish a claim for "custom" liability, Plaintiff must demonstrate:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the official of that misconduct; and
>
> 3) That Plaintiff was injured by acts pursuant to the government entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas County Medical Dept.*, 725 F.3d 825, 828 (8th Cir. 2013).

Fatal to Plaintiff's claim, "[a] single deviation from a written, official policy does not prove a conflicting custom." *Id.* at 828-9 (internal quotation and citation omitted).  Without more than Defendant Merchant's isolated mention of a white underwear only policy, Plaintiff has not established a custom of the HCDC.  Accordingly, Plaintiff's official capacity claim regarding the white underwear only custom must fail as a matter of law.[15]

## IV. CONCLUSION

For the reasons stated above, the undersigned recommends that the Defendants' Motion for Summary Judgment (ECF No. 30) be **GRANTED in part** and **DENIED in part.**

Specifically, all of Plaintiff's claims should be **DISMISSED WITH PREJUDICE,** save and except for, Plaintiff's claim of excessive force against Defendant Merchant, in his individual capacity only, for Merchant's use of OC Spray on January 7, 2022.  This claim should remain for

---

[15] The Court need not address the question of whether any such custom caused the alleged excessive force as no custom has been established.

further litigation. Accordingly, Defendants Hickey, Gully, Wise, and Singleton should be dismissed from this matter.

The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

Referral Status: Referral should be terminated.

REFERRED this 1st day of July 2024.

_Christy Comstock_
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE